[No. 27224.    Department One.    January 13, 1939.]

C. W. BRIDGHAM, *Respondent,* v. PACIFIC COAST PAPER MILLS, *Appellant.*[1]

*Walter B. Whitcomb,* for appellant.

*Sather & Livesey,* for respondent.

MAIN, J.—This action was brought to recover the balance claimed to be due for services rendered as a broker. The cause was tried to a jury, and a verdict

[1]Reported in 86 P. (2d) 201.

was returned in favor of the plaintiff in the sum of $7,846.40, together with interest. The defendant moved for a judgment notwithstanding the verdict and, in the alternative, for a new trial, both of which motions were overruled, and, from the judgment entered upon the verdict, it appeals. Since the appeal was taken, C. W. Bridgham, who instituted the action, has died, and his widow, as administratrix of his estate, has been substituted as the party respondent.

The appellant, the Pacific Coast Paper Mills, is a corporation organized under the laws of this state, and operates a paper mill at or near the city of Bellingham, in Whatcom county. J. J. Herb is president and manager of the corporation, and V. A. Hughes, secretary. Bridgham resided in the city of Bellingham and was engaged in the brokerage business, selling stocks and bonds.

The appellant was indebted in approximately the sum of one hundred thousand dollars, which was secured by a trust deed. That obligation matured October 1, 1936. In addition to this, the appellant owed, on a second mortgage, $37,400, bearing eight per cent interest. It had five hundred shares of cumulative preferred eight per cent stock and forty-five thousand shares of common stock. The unpaid and accumulated dividends upon the preferred stock amounted to eighty-four thousand dollars.

October 2, 1935, the appellant and Bridgham entered into a contract, having for its purpose three things: First, Bridgham was to undertake to procure from the second mortgage bondholders their consent to a reduction in the rate of interest on the second mortgage, and also their consent to the placing of a mortgage of approximately one hundred thousand dollars on the property of the appellant as a first, superior, lien; second, Bridgham was to undertake to secure the consent

of the holders of the preferred stock to a reduction of dividends thereon until such time as the new mortgage should be given to replace the then first mortgage, and also to secure the consent of the preferred stockholders to exchange their accrued and preferred dividends for common stock of the appellant; and third, that Bridgham would undertake to refinance the debt secured by the trust deed or mortgage by borrowing upon the security of the plant, assets, and property of the appellant the necessary amount of money for that purpose.

For each of these items, a separate compensation was fixed, with a general provision that, if they were all accomplished, the compensation should be twelve thousand dollars. The first and second items were carried out in accordance with the terms of the contract, and the compensation therefor was paid. About this, there is no controversy. The third item, that is, the negotiating for sufficient money to take up the then first lien against the appellant's property, was not accomplished within the time specified in the contract; but, by oral agreement, the time was extended, and Bridgham continued in his efforts to secure the necessary money.

In pursuance of his efforts, Bridgham, sometime in the spring or early summer of the year 1936, approached the Bellingham National Bank in an endeavor to secure a loan which would take care of the one hundred thousand dollar, or approximately one hundred thousand dollar, obligation of the appellant. He had a conversation first with Henry P. Jukes, who was vice-president and cashier of the bank. Bridgham recognized, and stated, to this officer that he realized that that bank could not handle a loan so large, but suggested that Jukes take the matter up with its correspondent, the First National Bank of

Seattle. Bridgham reported this conversation to the president and secretary of the appellant, and they gave him reports which showed the assets and financial condition of the appellant. These reports, Bridgham gave to Jukes.

Thereafter, Bridgham discussed the matter from time to time with Jukes and, occasionally, with one of the other officers of the bank. Bridgham suggested, during his talk with the officers of the Bellingham National Bank, that, in the event they cooperated in making the loan, the account of the appellant would be moved from another bank in Bellingham to their bank, and, after the loan was made, the account was so transferred.

Nothing was immediately accomplished. Bridgham, however, continued his efforts to secure a loan for the appellant. He went to Vancouver, B. C., and interested two brokerage concerns in the matter, which had the approval of the president of the appellant, and these negotiations proceeded to the point where an option was signed with those brokers for a short period of time, giving them the opportunity to secure the necessary money for the appellant.

About this time, Jukes, the vice-president and cashier of the Bellingham National Bank, and Hughes, the secretary of the appellant, went to Seattle and arranged with the First National Bank to loan the appellant eighty-five thousand dollars, which was secured by a mortgage upon its property. Of this loan, fifty-five thousand dollars was carried by the First National Bank of Seattle, and thirty thousand dollars by the Bellingham National Bank. The Vancouver option was canceled, on the ground that the president of the corporation had not been authorized by the directors thereof to make such a contract.

After all these things happened, Bridgham approached the president of the appellant and made inquiry with reference to the balance due him as compensation, and Bridgham testified that that officer assured him that he would get his commission in the full sum specified in the contract. The money not having been paid, the present action was begun, and resulted as above indicated.

■ The first question upon the appeal is whether the loan made by the First National Bank of Seattle in the sum of eighty-five thousand dollars was covered by the contract. The appellant argues that, since the amount borrowed was eighty-five thousand dollars, and not one hundred thousand dollars, and the time and terms of payment were different from those specified, that loan did not satisfy the terms of the contract. It is further said that the contract was a special one; and, if Bridgham was entitled to recover at all, it would, of necessity, be on the *quantum meruit,* inasmuch as the one hundred thousand dollars was not secured.

These contentions are not borne out by the terms of the contract. It was not a special contract for a fixed sum on fixed terms, but it was one that was flexible, and all the things that were specified to be done were to be acceptable to the appellant. In paragraph 1 of the contract, it was provided that Bridgham was to secure the consent of the second mortgage bondholders to the placing of a mortgage

". . . of approximately One Hundred Thousand ($100,000) Dollars (whatever sum may be necessary to refund the present first mortgage) . . ."

In paragraph 3, after referring to the then existing mortgage as being in the sum of one hundred thousand dollars and the terms upon which the new loan should be made, it is provided that that loan, when made, should be "on terms acceptable to the party of the

first part [the appellant]." There is the further provision that

"The party of the second part [Bridgham] shall present to the party of the first part [the appellant] a plan or plans for said refinancing, and such plan must be acceptable to the party of the first part [the appellant]."

It thus appears definitely that whatever was done was to be acceptable to the appellant, and that Bridgham was to present a plan or plans for refinancing. The eighty-five thousand dollars, if it was sufficient to refinance, and was acceptable to the appellant, would be within the terms of the contract.

The second contention of the appellant is that Bridgham was not the procuring cause of the loan made by the First National Bank of Seattle, of which the Bellingham National absorbed a part. The loan made by the First National was in exact accord, except as to the amount, with the plan which Bridgham had proposed to the officers of the Bellingham National and urged them to endeavor to carry through. In addition to this, as above suggested, after the matter was closed up, Bridgham testified to a conversation between himself and the president of the appellant corporation, as follows:

"Q. You told us about his saying that they had finally received the money from the Bellingham National and the Seattle First National Banks, and what did he say then about your commission? A. He said he would protect me on my commission; it was due me; the work had been done on all of it. Q. He knew you had contacted the Bellingham National Bank and explained this entire set-up to them, did he? A. Many times I discussed that with him; in fact, every week through the whole period."

This testimony was not disputed.

From the facts stated and the testimony set out as to the conversation with appellant's president, we are of

the view that the jury had a right to find that Bridgham was, in fact, the procuring cause of the loan made by the First National Bank.

The appellant further complains of an instruction given, as well as of the failure of the trial court to give certain requests, and complains of the ruling of the court with reference to admission of evidence and also the rejection of offered evidence. We shall not pursue these contentions in detail. It is sufficient to say that they have all been considered, and we do not find in any of them substantial merit.

The judgment will be affirmed.

BLAKE, C. J., MILLARD, STEINERT, and ROBINSON, JJ., concur.